UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


John W. Gebo

    v.                              Civil No. 11-cv-047-JD
                                  Opinion No. 2012 DNH 100

Robert Thyng


O R D E R

      John W. Gebo, an inmate in the New Hampshire State Prison system, brings an action pursuant to 42 U.S.C. § 1983 against Robert Thyng, who was the Unit Manager at the Northern Correctional Facility ("NCF") in New Hampshire when Gebo was assaulted in September of 2009. Gebo alleges that Thyng violated his Eighth Amendment rights by failing to protect him from assault by other inmates. Thyng moves for summary judgment on the ground that Gebo failed to exhaust his administrative remedies. Gebo objects.

      A hearing was held on May 22, 2012. Thyng did not attend the hearing but instead submitted his deposition for consideration. Three witnesses testified on behalf of Thyng: Ann Marie Morin, who was a sergeant at NCF in September of 2009; Edward S. McFarland, Jr., who also was a sergeant at NCF; and Diane R. Bouthot, who is the administrative secretary to the

Warden at NCF. Gebo testified, and David Peters, who was an inmate at NCF in September of 2009, testified on behalf of Gebo.

## Standard of Review

The Prison Litigation Reform Act of 1995 provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Section 1997e(a) requires "proper exhaustion." Woodford v. Ngo, 548 U.S. 81, 88 (2006). Proper exhaustion means that a prisoner must complete the grievance process in the manner required by the prison. Jones v. Bock, 549 U.S. 199, 218 (2007). Because the administrative exhaustion requirement under § 1997e(a) is an affirmative defense, the defendant bears the burden of proving that the plaintiff failed to exhaust. Id. at 216; Casanova v. Dubois, 304 F.3d 75, 77 n.3 (1st Cir. 2002); Starr v. Moore, --- F. Supp. 2d ---, 2012 WL 1034452, at *3 (D.N.H. Mar. 28, 2012).

As noted in the previous order, the parties' summary judgment memoranda and supporting materials demonstrated that material facts are in dispute as to whether Gebo exhausted his administrative remedies. All courts that have considered the

issue have concluded that there is no Seventh Amendment right to a jury trial on disputed factual issues for purposes of deciding the § 1997e(a) exhaustion issue.  See, e.g., Messa v. Goord, 652 F.3d 305, 308 (2d Cir. 2011) (citing cases).  Instead, the trial court resolves factual disputes related to the exhaustion defense and decides whether the defendant has carried his burden of proving that the plaintiff failed to exhaust administrative remedies.  Pavey v. Conley, 544 F.3d 739, 742 (7th Cir. 2008).

## Background

Gebo, proceeding pro se and in forma pauperis, filed a complaint alleging claims under § 1983.  On preliminary review, the magistrate judge recommended dismissal of Gebo's Fourteenth Amendment claim and ordered service on Robert Thyng of Gebo's Eighth Amendment claim.  Gebo's motion for appointment of counsel was granted.  An attorney entered an appearance on Gebo's behalf and filed an amended complaint, alleging that Thyng violated Gebo's Eighth Amendment rights by failing to protect him.  Thyng moved for summary judgment, and Gebo objected.

The following background information is taken from the parties' summary judgment materials, along with the testimony and evidence presented during the hearing.

John Gebo was an inmate at the Northern New Hampshire Correctional Facility in September of 2009.[1]  At that time, NCF was overcrowded, housing 200 inmates more than its peak capacity.  In addition, the number of staff had been reduced by layoffs.  Although inmates were not supposed to move between the two housing levels in the prison, in 2009 they were able to access the stairs and did move between the levels.

On September 2, 2009, Gebo was attacked by other inmates who hit him repeatedly, causing a large gash on the back of his head and other injuries.  Gebo knew that at least two of the attackers were members of a prison gang, and he believed he was attacked because he refused to join a gang.  He was treated at Androscoggin Valley Hospital for his injuries and returned to the prison that night.

When he returned to the prison, Gebo was placed in Administrative Review status.  The next day, September 3, Gebo told Unit Manager Robert Thyng that he needed to be in protective custody because he had been assaulted by a known gang member.  Thyng denied his request and returned Gebo to general population,

---

[1] The units are also referred to as pods and blocks.  Gebo initially was housed in A Unit, which is on the first level of the prison, along with B, C, and D Units.  E, F, G, and H Units are on the second level.

although Gebo was moved from Unit A on the first level to Unit E on the second level.

Gebo prepared a request slip in which he asked to meet with Thyng for an explanation as to why his request for protective custody was denied. On his way to the request slip box which was located outside of the sergeant's office on the second level, Gebo met another inmate, David Peters, whom he knew. Peters was surprised to see Gebo in the second level hallway because he thought Gebo was in A Unit on the first level and asked him what he was doing up there. Gebo told Peters about the assault and showed him the gash on his head and other wounds. Peters was shocked and asked Gebo why he was not in the health services unit. Peters was aware of the danger from gang members in prison and thought Gebo should be moved out of the prison. Gebo showed Peters the inmate request slip he had completed and explained that he was very concerned for his safety and was trying to get a meeting with Thyng so that he could have a protective custody hearing and be moved out of NCF. Peters saw the inmate request slip, which was addressed to Thyng and had extensive writing on it, and saw Gebo put the slip in the box outside the sergeant's office. Gebo got no response from the request slip, and he remained in general population in the prison.

On September 5, 2009, Gebo was assaulted again by inmates who threw boiling water on him and hit him with a lock. Gebo was treated for burns, lacerations, and bruising at Androscoggin Valley Hospital. Following that attack, Gebo spent several days in health services at NCF. He was placed on Administrative Review status but again was returned to the general population, F Unit. Gebo completed and submitted another request slip addressed to Thyng, asking for a meeting about the assaults and his need for protective custody, but did not receive a response.[2]

A few days later, Gebo spoke to Sergeant Morin about his situation, and she told Gebo that she would call Thyng. Gebo raised the protective custody issue again at his classification review, which was held on September 17, 2009, but was told that protective custody was not an issue for consideration by the classification review board. His classification remained the same. Gebo talked with Morin again who suggested he contact Sergeant McFarland. Gebo asked McFarland for a grievance form but was told that he had to wait for a response from his request slips before he could have a grievance form.

---

[2] No one else saw this request slip. Prison officials have searched the files and did not find inmate request slips from Gebo that asked for a meeting with Thyng about Gebo's safety or his request for protective custody. Gebo's testimony about the second slip was less clear than for the first slip.

On October 15, 2009, Gebo told Morin that he was in fear for his life. Morin told Gebo to write his complaints in a statement. Gebo wrote that inmates in the BOWW gang were charging him "rent", which he could not afford, and that he was afraid because he had been attacked twice. Morin then escorted Gebo to administrative segregation, where he was held over night. The next day, when officers attempted to move him back to general population in C Unit, Gebo refused to move, saying that he could not stay in general population because of threats to his safety. Gebo was written up for a minor disciplinary offense, and he pleaded guilty. When officers returned to move him, Gebo again refused to move and was written up for a major disciplinary offense and was transferred to the secure housing unit. Gebo remained in the secure housing unit.

Prison officials found several request slips that Gebo filed in November and December.[3] On November 3, he submitted a request slip asking to have his property brought to him. On November 12, he submitted a request slip asking for permission to use a telephone in another area because the telephone available to him was broken. On November 22, Gebo submitted a request slip asking the director of classifications if he could be transferred to

---

[3] Gebo's file also has request slips submitted by him during 2010.

another state.  On November 27, he asked to speak with the unit manager, identified as Craig Thyng, apparently about getting property returned to him from another unit.  On December 6, Gebo wrote to the director of classifications, saying that it was "imperative" that he talk to her about his classification status.  He stated that he had been assaulted twice, that he could not be returned to general population because of the gangs, and that the secure housing unit was not supposed to be used as a form of protective custody.  He asked to be transferred to a county jail.

On December 8, 2009, a protection review board was held to consider Gebo's classification, and the board recommended that Gebo be put in protective custody.  The classification was approved on December 10, 2009, with the notation that Gebo would remain in the secure housing unit pending an out of state transfer.  Gebo was eventually transferred to Merrimack County House of Corrections and later to the state prison in Concord where he is being held in protective custody.

The process for administrative review of inmate issues is provided in a document titled "Grievances and Complaints by Persons under DOC Supervision" PPD 1.16 (May 15, 2007) ("PPD 1.16").  The first level of review requires an inmate to submit a request slip to the lowest level staff person with authority to address the issue.  A response to a request slip is to be

provided to the inmate within fifteen working days. The first step, filing a request slip, may be waived only "when the inmate can demonstrate that using the process is likely to result in identifiable risk of harm to their [sic] physical safety or psychological well-being." Id. IV(A)(4). The second step requires the inmate to submit a grievance form to the warden within thirty days after receiving a response to a request slip. The third step is a grievance to the commissioner.

Thyng, Morin, and McFarland testified to different versions of the review process. Thyng also testified that the procedure provided by PPD 1.16 had been changed by a memorandum from the Commissioner of the Department of Corrections. Under the changed procedure, officers were required to give grievance forms to all inmates who asked for them. Thyng testified that not all prison officers followed the Commissioner's direction.

## Findings of Fact

1. Gebo asked to be placed in protective custody after he was assaulted on September 2, 2009, and his request was denied.
2. Gebo completed an inmate request form in which he asked to meet with Thyng for an explanation of why his request for protective custody was denied.

3.  Gebo put the inmate request form into the appropriate box on September 3, 2009.

4.  Gebo did not receive a response to the inmate request form.

5.  Following the assault on September 5, 2009, Gebo went to the control center, known as the bubble, and asked to speak with Thyng but was told that Thyng was not available.

6.  Gebo spoke to Sergeant Morin about his safety concern, and she said she would call Thyng.

7.  Gebo did not receive a response from that conversation.

8.  At a classification review held on September 17, 2009, Gebo asked for protective custody but was told that the review board could not make that decision.

9.  The same day Gebo talked to Morin again about his situation, and Morin suggested that he talk to Sergeant McFarland.

10. Gebo asked McFarland for a grievance form, but McFarland said Gebo had to wait for a response to the inmate request slips before he could have a grievance form.

11. A review board granted Gebo protective custody status in December of 2009.

12. PPD 1.16 provided the official administrative procedure for inmates to seek review of issues, although the procedures may have been amended by memoranda from the Commissioner.

13. During the fall of 2009, the officers at NCF did not all

follow the same procedure for administrative review of inmate issues and did not necessarily follow the procedure as it is provided in PPD 1.16.

14. Thyng, Morin, and McFarland have no memory of the events involving Gebo in September of 2009 and no memory of whether Gebo submitted inmate request slips asking for a meeting with Thyng to discuss his need for protective custody.

15. No request slips from Gebo, dated in September of 2009 and asking for a meeting with Thyng about protective custody, were found in the prison files.

## Ruling

Thyng contends that Gebo cannot maintain his suit because he did not exhaust the administrative remedies provided by PPD 1.16. Gebo acknowledges that he did not complete the three-step process provided by PPD 1.16 but argues that he was prevented from doing so by Thyng's failure to respond to his request slips. Thyng contends that Gebo did not file any request slips that asked for a meeting with Thyng to discuss protective custody and contends that even if such slips were filed and he received no response, Gebo should have sought a waiver from the request slip step or filed a grievance.

As was discussed in the prior order, because exhaustion under § 1997e(a) is an affirmative defense, it may be subject to equitable considerations such as tolling, estoppel, and waiver. See, e.g., Amador v. Andrews, 655 F.3d 89, 103 (2d Cir. 2011); Casanova, 304 F.3d at 77 n.3 (1st Cir. 2002). In addition, § 1997e(a) requires exhaustion of only "such administrative remedies as are available." If prison officials make administrative remedies unavailable by misconduct, mistake, or inaction, the exhaustion requirement is obviated. See, e.g., Beaton v. Tennis, 2012 WL 266967, at *2 (3d Cir. Jan. 31, 2012) (unpublished decision); Tuckel v. Grover, 660 F.3d 1249, 1254 (10th Cir. 2011); Moore v. Bennette, 517 F.3d 717, 725 (4th Cir. 2008); Macias v. Zenk, 495 F.3d 37, 44-45 (2d Cir. 2007); Kaba v. Stepp, 458 F.3d 678, 684-85 (7th Cir. 2006); Perfetto v. N.H. State Prison, Warden, 2008 WL 943372, at *6 (D.N.H. Apr. 8, 2008). In particular, remedies are not available if prison officials fail to respond to a properly filed form or refuse to provide forms to an inmate who requests them. Sapp v. Kimbrell, 623 F.3d 813, 822-23 (9th Cir. 2010) (citing cases).

Gebo properly submitted a request slip addressed to Thyng by putting the request slip in the appropriate box on September 3,

2009.[4] Gebo received no response. Gebo then asked Morin for help, and she referred him to McFarland who told him he could not have a grievance form until he received a response to his request slip.[5] Because neither Thyng nor anyone else responded to the request slip or slips and Gebo was told he could not have a grievance form until he received a response, prison officials made administrative remedies unavailable.[6] See, e.g., Moore, 517 F.3d at 725 ("[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it."); Kaba, 458 F.3d at 684 ("[W]hen prison officials fail to provide inmates with the forms necessary to file an administrative grievance, administrative remedies are not 'available.'"); Dole v. Chandler, 438 F.3d 804, 810-11 (7th Cir. 2006) (holding that when prison officials were responsible for mishandling a complaint inmate did

---

[4] Gebo may also have submitted a second request slip after the assault that occurred on September 5.

[5] McFarland may also have required inmates to file a request slip for a grievance form.

[6] Under PPD 1.16(IV)(A)(5), prison officials were supposed to respond to a request slip within fifteen "working days" after receiving it. Assuming "working days" do not include weekends, the response time for Gebo's slip filed on September 3, 2009, would have expired on September 24, 2009. Gebo testified, however, that the prison officers at NCF told inmates that they would get responses within seven days, which would have made the deadline September 14.

not fail to exhaust); Russo v. Honen, 755 F. Supp. 2d 313, 315 (D. Mass. 2010) (failure to provide grievance form makes remedy unavailable); Braxton v. Ross, 2010 WL 1713614, at *1 (D. Mass. Apr. 27, 2010) ("[A] prison's failure to comply with its own procedures (such as failing to timely respond to a grievance) may excuse a failure to exhaust."). Gebo is not required to exhaust unavailable remedies.

To the extent Thyng argues that Gebo should have filed a grievance to address his safety concerns, that procedure would be contrary to the three-step process provided in PPD 1.16. In addition, as noted above, McFarland refused Gebo's request for a grievance form, making that remedy unavailable. Thyng also argues that Gebo should have applied for a waiver under PPD 1.16 IV(A)(4). As the court decided in the prior order, PPD 1.16 IV(A)(4) does not apply to the circumstances in this case and, therefore, does not provide an alternative remedy that Gebo should have pursued.

Thyng did not carry his burden of showing that Gebo failed to exhaust available administrative remedies. Therefore, Gebo's suit is not barred by § 1997e(a).

<u>Conclusion</u>

For the foregoing reasons, the defendant's motion for summary judgment (document no. 35) is denied.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
United States District Judge

June 7, 2012

cc: James Spencer Culp, Esquire
    Theodore M. Lothstein, Esquire
    Nancy J. Smith, Esquire